The next matter is Toledo v. Indymac. Good morning, Your Honors. Martin Brice and with me Damian DeNicola for the appellant defendant, One West Bank. I respectfully reserve five minutes for rebuttal. Very good. There's no dispute about the basic facts of this case. The plaintiffs, the Toledos, obtained a loan. We're aware. Yes. We know there are many issues in this matter. There are. The first issue I'd like to address is FIREA, which I know you're familiar with, Your Honor. And the point I wanted to make there is this. The entity that originated the loan was Indymac Bank FSB, which failed in July 2008, a year after the loan was originated. Approximately a year later, in March 2009, the FDIC, as receiver, transferred certain assets of the failed Indymac to One West. Later that year, the Toledos demanded the cancellation of their loan. And when One West failed to cancel the loan, the Toledos sued. The entire premise for both their demand that the loan be canceled and their subsequent suit involved Indymac's conduct. You do nothing more than read the amended complaints or the trial court's findings of fact and conclusions of law here. They're all about the origination of this loan, how it was originated, what took place when it was originated, what disclosures the Toledos did or didn't receive. Well, that's just – failure to give notice simply delays the right to rescind. Is that correct, under the Pennsylvania unfair treat? Well, yes. The Door-to-Door Sales Act, in that respect, is similar to Thailand. They had a continuing right to rescind, they contend, because of their failure to obtain the notice. Correct. And the cause of action, they say, arises from the failure to rescind on the part of One West. That I disagree with, Your Honor. And accepting that premise would essentially eviscerate firea. Because what would happen is every purchasing institution would be opened up to claims not only under the Pennsylvania Door-to-Door Sales Act, but the laws of all 50 states, as well as Thailand itself, and as well as, for instance, common law fraud. Any statute or any common law cause of action that would allow you the right to rescind, notwithstanding firea's terms and what liabilities were or weren't transferred to the purchasing institution, you as a plaintiff borrower would be able to come in and say, we got you. Okay. But do we have to go that far? They are very clear that the claim that they're bringing is for One West's own violation of the law, its own misconduct. It's the only misconduct that's alleged in the complaint, the only involvement of One West, is that it didn't take steps to refund payments to plaintiffs or terminate security interest with attendees. That's it. And the district court, as I read the opinion, didn't find that One West did anything wrong. So the whole claim against One West must be based upon, even though under firea it can't be, the misconduct of IndyMac. Exactly, Judge Barry. It is. It's not based on anything One West did, because One West did nothing other than fail to say, sure, the loan's canceled. So there's no jurisdiction. Exactly. That's it exactly, Your Honor. And the argument they try to make, and it puts the proverbial rabbit in the hat, is, no, we're not suing you, One West, because of anything IndyMac did. We're suing you for failure to honor our cancellation demand. But they didn't make a gratuitous cancellation demand. In order to seek and ultimately sue for the failure to cancel a loan, you have to premise that on something, such as, for instance, a material violation of TILA, or the failure to obtain a notice of right to cancel under TILA, or the failure to get the notice they contend was required under the Door-to-Door Sales Act, and that failure was IndyMac's, not One West's, failure. All right, let me ask you a question. If, supposing we say firea does apply, and then the plaintiffs have to seek an administrative remedy, are they time-barred on that? Well, firea provides for, from notice, at least 90 days. So has that time likely passed, Your Honor, looking at a calendar? I think that's a safe conclusion. However, what every court to have squarely looked at this issue, and most recently the Ninth Circuit and Benson, and we submitted that through a 28-J letter, but the D.C. Circuit, the Sixth Circuit, the Ninth Circuit and Benson, the Eleventh Circuit, has said litigants can't create their own bed, and then by failing to even attempt to exhaust their administrative claims, sue the purchasing institution, and then say, oh, well, now we can't sue, or we can't bring a claim against the FDIC. To allow them to do that, as every circuit to have looked at this issue has held, would eviscerate the statute. I mean, it would completely excuse them. If they wanted to, they could bring a claim against you for your own misconduct that's not tied to Indenac, your independent misconduct, but then I think, and Benson, I think, makes this fairly clear, then even though it might not be run into firea, there's nothing alleged here that would state a claim under any law. It's just they didn't cancel. I agree. They didn't do anything. If you look at not only the amended complaint, but the letter demanding cancellation itself, it's all Indenac. I mean, for instance, Your Honor, there's, I think, little question that if after One West purchased this loan, it just, for whatever reason, tripled their interest rate or imposed a fee that the notor mortgage didn't require, that would be One West's wrong, and firea would have nothing to do with that. But that's not this case. What this case is is Indenac's failure to give them the notice they contend was required by the Door-to-Door Act, and that's plainly strategic pleading, which every circuit has said firea bars. If I might briefly just touch on two other issues, number one, HOLA. Clearly, we're talking about a disclosure here, and clearly that falls within B9 of the OTS regulation. Clearly, this deals with the origination and servicing of this loan. So clearly that is within B10. The district court ignored both B9 and B10 of the operative OTS regulation and just assumed that this was a generally applicable commercial law. It plainly is not. It is plainly a disclosure. The case is plainly premised upon a state law that required a certain disclosure they contend, and their alleged failure to receive that disclosure. It's on all fours with B9 and B10. It's not a generally applicable commercial law such as, say, a breach of contract where, again, using my hypothetical, if we'd invented some fee post-purchase and started charging them for it, then that would obviously be outside of B9 and B10 in all likelihood. They'd be able to sue for breach of contract. That's not this case, though. So their claim is also preempted under HOLA. If we were in the Seventh Circuit here, what would your argument be? It would be the same. The Ockham case, which I think you're referring to, Your Honor, doesn't hold any differently. The court was dealing with a very unclear complaint there, and the court noted that it was impossible to definitively say which claims were preempted, which claims weren't, go back to the district court to sort this out. Here, again, the one thing that is plain about this case is it's a disclosure case. It's predicated entirely on their alleged failure to receive a disclosure mandated solely by state law. That's plainly within B9 and B10. So the state law here doesn't, it's not general commercial law, it's not general common law? Well, on a space, Your Honor, it's not. It's the Door-to-Door Sales Act. Among other things, you have to have, for instance, a door-to-door sale, $25 more of a good or a merchandise. Under no stretch of the imagination is that generally applicable. Help me here. Supposing there is jurisdiction. Yes. Supposing there's no preemption. Under Hull, correct, Your Honor. Or Tyler, or either or.  Supposing all of their arguments go their way and we say the district court was right to void the loan. Don't they still lose in the sense that they have to pay back what was paid to them or paid on their behalf? They cannot just receive what they paid in so that I'm not sure they win, even if they win. But is there a time limit on when they had to demand back the principal amount? And your failure to demand back the principal amount within the time limit, doesn't that then bar you from requesting that the principal amount be returned to you? Well, I would agree with you, Your Honor. And one of the other egregious things about the district court's order here, to answer your question, Judge Barry, is they don't have to return anything. The district court's order requires us to return every single payment they made, whether or not that payment is made up of not only interest or fees, but principal as well as escrow items, such as taxes and insurance we paid on their behalf. We have to give it all back to them. I'm talking about, right, that's one aspect. The other aspect is them returning the principal amount to you. And aren't you time barred from asking that they do that? We, Your Honor, no. I would say we are not time barred. Because isn't there a time limit in the statute? I don't believe that's correct, Your Honor. Well, rescission is an equitable remedy. I don't know if it would be equitable to make you pay the whole thing and, you know, they pay nothing. As we note in our brief, there's very little law on this, but the Door-to-Door Sales Act, like TILA, its intent if and when it applies and if and when it's violated is to return the parties to the status quo ante. And that clearly is not what is happening. Probably inequity in that point. Yes. I mean, there may be some equitable power to reorder or condition, but there's no power whatsoever in the statute, nothing that reads it in our view that would allow the district court, assuming everything you said, Judge Barry, to simply give them the house free and clear. Well, I just, I think I've gotten us all off the track. I mean, because I candidly think that the most important argument is the jurisdictional argument under FIRA. And it may even be, it may even be that if we have to dismiss for lack of jurisdiction, that might be a good result for the other side. Well, I do agree. In the sense that they would still have, you know, a loan that they've been paying off. I can't argue with you there, Your Honor. In no amount of time, but in fairness to my opponent, I did want to give you the opportunity to address or I wanted to address the penalty order here. The $10,000. An arbitrary $10,000. Can I begin that discussion by mentioning that I am the district judge who was reversed in Newton? Oh. I noticed that, Your Honor, but I didn't want to say anything. In some respects, frankly, I think this is a more shocking, frankly, penalty than there. It would have been easier for us in all candor if the district court attempted to coerce a settlement by just making us pay a $1,000 or a $10,000 fine, as opposed to demanding that our CEO in the job less than two weeks, who has never proffered as a witness here, who never had any involvement in the settlement negotiations, fly across the country on just a few days' notice. So do we remand to the district court so she can give notice? I would submit, Your Honor, no. There is no basis to remand. If we find the district court did not have jurisdiction, would that sanction fall of its own weight? That would be my initial position, yes, Judge Barry, that we shouldn't have been before the district court in the first place, so consequently the sanction order fails for lack of subject matter jurisdiction. I would submit it fails on its merits anyway, because it was plainly put in place to coerce a settlement, and it was directed just like the order in Newton, with all due respect, Judge Froth, solely on the defendant. I learned my lesson. Thank you, Your Honor. We never remember which cases we got reversed in, do we? Well, there always was a good reason for what we did as right, always. I try not to remember the cases I lose either, Your Honor. But I don't think there is any basis, because the order was plainly inappropriate under Rule 16, was plainly a violation of due process, was plainly arbitrary. It was a payment of $10,000 tied to nothing to the clerk of court. I think we understand that. Anything else you want to add? No, Your Honor. I have reserved five minutes, though. Okay. Thank you very much. Good morning. Scott Michaelman, public citizen for Jose and Maria Tejado. May it please the Court. In refinancing their mortgage, the Tejados negotiated one set of terms in Spanish and got another one on the contract they couldn't read that they signed in English. There was no notice of the right to cancel as required under Pennsylvania law, so the right to cancel never expired. When the Tejados tried to exercise it in August of 2009, the holder of their loan, One West, refused in violation of 201-7 E and G. It is that violation for which the Tejados are here seeking relief. Now, my opponent suggests that the FIREA jurisdictional bar must apply, because otherwise the courts are going to be flooded with claims against assuming banks for the misconduct of predecessor banks, the banks that used to hold those assets. But as the cases that both sides have cited in their briefs make clear, that is not true. When the assuming bank is charged with the originating bank's misconduct, the cases get thrown out. They've all gotten thrown out. But what those cases do not address is, and what a few cases have said can go forward, such as the D.C. Circuit in American National and the Ninth Circuit in Benson, is where the assuming bank is charged with its own misconduct. That's right. Okay, now your own, the only misconduct charged against One West is in paragraphs 35 and 37 of your complaint. Essentially, they did not take steps to refund payments to plaintiffs or terminate the security interest in their home. That's the only allegation as to One West. That's absolutely right, Your Honor. And it's possible that if the district court had gone beyond and awarded treble damages based on things that IndyMac had done deceptively, that could come within FIREA's bar. But this allegation relates only to One West's failure, which is a violation of the CPL Sections 201-7E and G. They had a duty to cancel. They didn't cancel. But not a duty to cancel based on their own misconduct. It doesn't matter where the duty to cancel. The only misconduct, you say, was the fact they didn't cancel. That's correct, Your Honor. But that right to cancel, that cancellation period existed under state law, whether One West liked it or not. So they had to comply with Pennsylvania law. They were the owner of the asset. When the Teodos exercised their right to cancel, the right to cancel hadn't run. That state's a claim under what law? I mean, just the Pennsylvania law? That state's a claim under the CPL, Your Honor, under Section 201-7G. You agree that nothing that happened with Enrique or none of the fact that the reason that they were supposed to cancel One West, that they had to cancel, we don't know the reason why. We can't know the reason why because, of course, that's all under FIREA. That would take the claim under FIREA. Right. If they sought a remedy for IndyMax misconduct, if they sought to pin that on One West and get damages for that, that might run into trouble. But now you're saying they should cancel, but there's no reason why they had to cancel. There is no reason why they had to cancel. They were able to cancel at that point because the notice of cancellation had not been given and so the cancellation period had not run as a matter of state law. And so it's true that it doesn't matter why. And the reason why this wouldn't open the floodgates is because this is a very unusual situation where the cancellation period remains open for all of this time. But because the cancellation period remained open We don't know why they had to cancel. That's not it. Because if we know why, if we know why they had to cancel, because Enrique and the broker and the Hondo, if we know why they had to cancel, you're into strategic pleading here and you're going through the back door or attempting to, but you're barred from going through the front. It's not a backdoor claim, Your Honor. If One West had complied with the cancellation demand that the Tejados made in August of 2009, when they, One West, owned the loan, would there be no lawsuit here? But they didn't own the whole loan. They owned the asset value of the loan, leaving the liabilities with FDIC. Those cannot be separated in that manner, Your Honor. Yes, they can if they are so separated in the agreement of transfer. Actually, in the analogous Tyler context, a number of What did the agreement between IndyMac and Firea, and then when Firea sold the IndyMac assets to One West, what did the agreement say about what One West was acquiring? It said it was requiring the assets and not the liabilities. Right. However, there are two sources of law here that make clear that they can't so easily get rid of the right to rescission that runs against that asset. First of all, under Pennsylvania law, the unassigner Pennsylvania law wouldn't affect the deal between IndyMac, excuse me, between FDIC and One West, would it? Well, it would in terms of what One West takes. Isn't that preempted by Firea? No, Your Honor. Well, because under Pennsylvania law, an assignor cannot assign more rights than he has. So the right to collect on the loan free from the right of rescission that goes along with it under state law, those are bundled together. They can't be separated out in that manner. And for this reason, a number of courts in the federal TILA context have held that the right of rescission exists notwithstanding Firea and notwithstanding agreements like this one in which failed banks' assets are transferred to an assuming bank without the liabilities. So, for example, in the King v. Long Beach mortgage case 672 F sub second 235 at 247, the District of Massachusetts held that notwithstanding a nonassignment of liabilities to the assuming bank, the homeowner could still exercise rescission versus the assuming bank. Which we're not bound by that, even if it's relevant. That's true, Your Honor. But there have been numerous cases following that case showing that one cannot separate the right to rescind and pull it off of the asset into this general category of liabilities. It runs with the asset itself. And so either they had the asset with the right to rescind or they didn't take the asset at all. In fact, under Pennsylvania law, the duties under the CPL are not waivable duties. So they couldn't separate it in that manner. I'll give you a hypothetical. Imagine if this were an entirely fraudulent mortgage. Imagine if they forged the Tejado's signature.  And imagine the IndyMac did all these things wrong and then ultimately it ended up in the hands of One West. Could One West collect on that loan because they'd taken the quote-unquote assets but not the liabilities and the mortgage was entirely fraudulent? I don't think they could. I think FIREA allows that a claim based solely on what the assuming bank has done and not trying to penalize them for anything that the failed bank did is still allowable. Otherwise, that fraudulent mortgage laundered. But your claim against One West is completely dependent upon what IndyMac did, what the failed bank did. It's really absent that, you've got no claim. Well, absent that, we've got no right to cancel because IndyMac failed to trigger the beginning of the right to cancel under Pennsylvania law. But since the right to cancellation still existed, when One West's mistake here, One West's misconduct was- But you're not talking about cancellation as to One West. You're saying did not take steps to refund payments to plaintiffs and terminate the security interest. But that is cancellation, Your Honor. That's what the complaint asked for. The refunding of payments, the cancellation of the security interest were the undoing of the transaction, which is what the district court ordered. But is the timeliness of this an issue, the 10 days, is that important for your independent claim? Your Honor, the timeliness issue as to whether the Teodos cancellation was timely- No, no. Okay. You said they didn't respond in time. Ah, right. Within 10 days, within 10 business days. And it seems to have real kind of sex appeal, the 10 days. I'm wondering, you mean it that way or not? Yes, Your Honor. When they failed to respond within 10 days, they violated their duty under Section 201-7G, which says they must cancel within 10 days. They also- We don't know anything about why they got to the point where they must cancel because that's FIRA. That's FIRA. So all we know is that as to some claims, we don't know what it is. They didn't cancel within 10 days. The only reason that IndyMac's conduct is relevant here is that the cancellation period remained open. That's all that matters. You can throw out everything else that IndyMac did, but because the cancellation period remained open, that was where One West's obligation comes in. Why would you cancel? Why is there a reason to cancel other than IndyMac's conduct? How can you avoid IndyMac's conduct here? Well, the reason to cancel, I mean, in terms of the Teodos reason to cancel or in terms of the legal justification? No, in terms of the legal reason. The reason why would you're faulting One West for not canceling, and you're not giving me a reason independent of what IndyMac did for why they couldn't. Well, it is true that IndyMac's failure led to the cancellation period not beginning to run, but we're not seeking damages from One West for IndyMac's deceptive practices, for instance. All we're getting here is the cancellation that the Teodos were entitled to under state law, and the state law exists to protect people like the Teodos who get into these door-to-door transactions in languages they don't understand, and it happens very quickly, and all of a sudden, they have an unaffordable mortgage. So contrary to this action, if you had exhausted your administrative remedies against IndyMac and FDIC, I'd have no problem with this. But they didn't. How could they, Your Honor? There's no indication in the record. They even knew they had a claim at that point,  because they didn't understand yet the terms of the mortgage, the way it worked, the way the interest would adjust and rise. So the claims process was of no use to them yet, because as far as they knew, they had gotten something different than what they bargained for. So in this case, not holding One West exempt from their duty to cancel imposed under state law would leave the Teodos in exactly the position that the Pennsylvania legislature designed to protect them from. But One West wasn't the seller. Well, One West assumed those duties under Pennsylvania law. It assumed certain things, but it didn't assume the duties that the seller should have committed, should have performed prior to the transfer to FDIC, did it? Yes, Your Honor, it did. Those got stuck in FDIC, and something more came out to One West. No, Your Honor. As a matter of Pennsylvania law, an assign or – Well, this is federal law we're talking about, not Pennsylvania law. Well, but Pennsylvania law governs the interpretation of the contract, and they couldn't take the assets not subject to the defenses and the counterclaims. Those are the holdings of the People's Pittsburgh cases and Himes, to which One West has no answer. It's bluff. But One West, just by common sense, did not sell the loan to the Teodos. Excuse me, Your Honor. Didn't sell the loan. They sold the asset, and the asset was subject to the defense of rescission. But is that what the Pennsylvania Act is designed to remedy? Yes, Your Honor. They're designed to remedy what happened through IndyMac. That act is designed to remedy what happened through IndyMac, isn't it? It's designed to give the consumer the opportunity to cancel a transaction that they were fooled with. And it's designed to have that right run with the contract. Now, usually in the normal case, and this is why this is an unusual case that won't have broad implications, usually that right runs out pretty fast. But when proper notice is not given, the right continues. The right continued to exist. And so it did exist when the Teodos sent One West their notice. Now, One West had 10 days to understand state law and figure out that they took this asset subject to a rescission right. And respectfully, contrary to Your Honor's suggestion, dismissing this case under FIREA would not help the Teodos. It would leave them with a loan they can't afford to pay and that Pennsylvania attempted to protect them from, but that because someone different holds it now would, if the court finds no jurisdiction. Well, I said it would help them. The alternative would be if we were to go and say, well, you know, the district court clearly should have given the correct remedy if she rescinded or voided the loan. And that would have been returning the parties to where they were precisely before the loan was granted, which means that they received $36,000 or $28,000 that Teodos received back and the $115,000 loan is returned. So, you know, that's where I'm saying, you know, better everybody just goes away here. Well, respectfully not, Your Honor. If the remedy was, if this court were to determine, as we think they should, as we think you should, that there is jurisdiction and there is no preemption and that there is a valid claim, if the only difficulty were with the remedy, as was stated in the complaint, under a different remedy, if the Teodos owed money, they could obtain other financing to pay back whatever money they owed. Now, we don't think they do. We think the law is clear that One West had 10 days, the same 10 days they had to cancel, to demand their money back. They didn't. That was their own mistake and they're stuck with it. So we don't think there's a problem with the remedy. But if that were the only problem, it would be appropriate to affirm in all other respects  Let's assume that you get through FREA. But I'd like you to talk a little bit about the Homeowners Loan Act. And what the district court did here has a lot of appeal. But how do you get around subsection B? Yes, Your Honor. I think the key question about subsection B is whether those categories in subsection B of the regulation refer to all laws affecting lending in any way or only laws that are targeted against lenders and lending practices. Why isn't this targeted? Well, it's not targeted, Your Honor, because the Door-to-Door Sales Act is a law of general applicability. It applies to all exchanges in the door-to-door context, whether you're selling a loan, whether you're selling a refrigerator, whether you're selling a stereo, whether you're selling plumbing services. This is a law of general applicability. I disagree with my opponent's characterization that carving out a door-to-door category makes it not generally applicable. The question is, was it generally applicable versus specific to lenders? And you can see that in the OTS 1996 opinion letter stating that the Indiana Consumer Protection Law was valid. The OTS explained in that letter that the Consumer Protection Law was not preempted because it applies, and now I'm quoting, without regard to whether the transaction involves an extension of credit. This is OTS's own interpretation, and we think it's a good one because it makes a clear dividing line, a dividing line embraced by the Seventh and the Sixth Circuits between those laws specifically aimed at an extension of credit and those laws like the Door-to-Door Sales Act here that apply broadly to all types of transactions. Now, the district court concluded that the Pennsylvania Act's language requirement was not preempted by federal law because it only incidentally affected lending, right? Yes, Your Honor. It went under C. She went under C without looking at B. Well, if it's not targeted at lending, it doesn't fall within those B categories, and the question becomes whether it is a general commercial and consumer law with only an incidental effect. The district court correctly found that it does have an only incidental effect because it requires at most, in this case, a couple of extra pieces of paper, more notice. How can a requirement be incidental if it affected the entire lending transaction here, and she threw out the lending transaction because of the incidental effect? Well, certainly if small requirements aren't complied with, they can have large consequences. So it's hardly incidental. Well, but the requirement itself is incidental. Hardly incidental. The requirement itself is incidental, respectfully, Your Honor, because all the Pennsylvania law required was additional notification to be given to the consumer. Now, that's got to be an easy thing to do. You provide an additional form. That's it. That's all that needs to happen here, and contrast that with the situation the OTS encountered with the California law that it discussed in its 1999 letter. In that case, it held the California law preempted because it applied differently county by county. It was impossible with its vague standards for banks to know what to comply with. This is very easy. The CPL says exactly what they have to provide and when and how. All they have to do is provide a couple of extra pieces of paper in a different language of the same thing that they've negotiated, and then the consumer is protected and they've complied with the law. Well, right back to what IndyMac did wrong. Well, that's the question of whether the CPL is protected, and I think to look at that, you do have to go back to the transaction and look at what IndyMac did wrong. Then you're back into FIRA. Well, FIRA doesn't prevent looking at the entire transaction for other purposes. The question is whether this court has jurisdiction over the specific claim that One West was liable for its own failure to cancel. So that's how FIRA comes in in that limited respect. So like the decisions in Benson and American National Insurance, we're seeking to impose liability on One West for One West's own conduct in derogation of state law. I see my time has expired, but what other questions do you have? Let me ask my colleagues if there's any other areas they would like to ask questions. No? Thank you very much, Mr. Michael. Mr. Rice? Yes, thank you again, Your Honors. I heard opposing counsel repeatedly invoke Pennsylvania law as the law that controls what One West did or did not purchase from the FDIC. That is plainly wrong. There is utterly no support for it. FIRA expressly in 1821 D2G and in several other provisions, and this has been recognized by the courts, most recently the Ninth Circuit in a case involving J.P. Morgan at 671 F3rd 1027, that FIRA expressly empowers the FDIC to both transfer and retain assets and liabilities. The FDIC has the power to determine whether or not it is going to transfer a liability, and nothing in FIRA and no authority says that has to be subject to the laws of 50 different states. It would patently make no sense. As this court has recognized, and as every court that's looked at FIRA has recognized, the statute serves two purposes. You want the orderly and prompt wrap-up without litigation of a failed financial institution, and FIRA wants to encourage other financial institutions to come in and purchase the assets of the failed institution. I mean, that is of critical importance to our financial system. If this court were to accept their argument, it's no understatement to say you'd be upending that. What was it we were supposed to do? Either not buy the asset, or in order to, if you accept their proposition, convince ourselves that we weren't buying some undue risk, go out and interview the tolados and every other borrower to make sure that the transaction wasn't in Spanish while we were at it. Should we have redone the finance charges to make sure there was no continuing right to rescind under TILA? And counsel's dead wrong when he says this is a rare case with a continuing right to rescind. TILA clearly grants that right, as do other state laws and the common law. Should we have interviewed the tolados and every other borrower to make sure that they, in fact, got the two notices of right to cancel under TILA? Under this court's decision in Capuccio, we can't rely upon the acknowledgment. What kind of a monkey wrench would that throw into the FDIC's attempt to promptly and expeditiously wrap up the failed IndyMac to convince us and every other financial institution out there that might be buying the assets or the loans of a failed institution to do so? If you accept their argument, we'd be crazy if we did it because we'd be buying unknown liabilities, and FIREA is precisely structured to prevent that. They don't dispute that under the Master Purchase Agreement, pursuant to its express powers under FIREA, the FDIC retained all liabilities, period. They don't dispute that, as a matter of fact, they couldn't have gone into the FDIC and demanded whatever relief they wanted from the FDIC after the FDIC took over IndyMac in 2008, and they did have notice of that failure. In the appendix at page 420 is correspondence from their counsel, the Tolado's counsel in early 2009 to IndyMac Federal, which is one of the institutions created by the FDIC as part of this process, noting that they'd received notice in July of 2008. They knew. Now, even if you were to assume for the sake of argument that they didn't know about all of this, I would submit that their dispute then is with the FDIC, not the purchasing institution. And, in fact, under FIREA, and it's B-5-B-N-C, there's an exception to the timeliness requirement where claims are concerned before the FDIC if you contend and you can demonstrate that you didn't actually receive notice. But they didn't try any of that. As the Ninth Circuit noted, in Benson, they simply assumed futility, and there's no reason to assume futility, and that does not excuse strategic pleading. And that, as you put it, Judge Barry, is precisely what they are attempting to do here, and that's precisely what FIREA does in countenance. Now, what they can't escape is they, unlike Benson and a number of other cases, and they're cited in the briefs, in Benson, for instance, there was the contention in the Ninth Circuit properly said this is outside FIREA, where J.P. Morgan, the purchasing bank, continued to engage in the alleged Ponzi scheme. That's different, obviously. There's no allegation that we continued to engage in our own wrongdoing. You've got other cases like, excuse me, the American National Insurance case or the Village of Oakwood case, where actually it's really American National Insurance, where there was an allegation that J.P. Morgan Chase itself engineered the downfall of WAMU. Well, that was obviously independent misconduct by J.P. Morgan Chase. If true, that's obviously outside of FIREA. They can't point to anything like that here, and they don't because they're— As to any independent supposed claim, there would be failure to state a claim, probably. Yes, Your Honor. Because that's what it was in Benson, wasn't it? Well, yes. And what the Ninth Circuit ended up saying was you failed to state any misconduct by J.P. Morgan Chase. But if there had been, if you had, then clearly that would be outside of FIREA. Now, they did seek damages from us, by the way. I mean, that's plainly incorrect when they say they only sought cancellation. Subparagraph E of their amended complaint at page 62 of the appendix, they sought treble damages from us. Now, ultimately, the district court declined to award damages, but they sought them from us. The district court in the opening paragraph described it as a damages case. Well, I mean, at the end of the day, it's a practical matter, Your Honor. That's what this is because what we are going to be required to do is write them a check, returning every single dime they ever paid. And that, frankly, as a practical matter, is damages. And that's simply not countenanced by FIREA. Their amended complaint also, by the way, sought to have the district court set a different obligation for them to repay over time, which the district court also declined to do. And I would submit to answer your earlier question, Judge Roth, there was no basis in the Door-to-Door Sales Act to require that. Subparagraph A said they had to tender any merchandise to us in connection with their cancellation demand. Subparagraph I also speaks to merchandise being tendered. The district court, of course, concluded, well, this was a service, though, and I would submit the district court can't have that both ways, which is another way in which it erred. I mean, ultimately, the Door-to-Door Sales Act is really a square peg that the district court tried to fit through a round hole. It just doesn't fit where this kind of case is concerned. And there's simply no support for the ultimate remedy that the district court interposed here. If there's nothing else, I don't want to take up any more of your time. Thank you, Mr. Bryce. Counsel did an excellent job. We thank you very much. The case was very well argued. We'd like to have a transcript made of the argument and ask you to share in the costs of preparing the transcript. And if you would go by the clerk's office before you leave, they'll tell you how to do that. That will give us an opportunity to review the argument in some detail. Thank you very much.